KATHRYN BARCROFT, *pro hac vice pending*
kbarcroft@fedemploylaw.com
ARIEL E. SOLOMON, *pro hac vice pending*
asolomon@fedemploylaw.com
300 Great Oaks Blvd Ste 312
Albany, New York 12203
Tel: (866) 833-3529
Fax: (202) 688-1896

MAJED DAKAK (SBN 271875)
mdakak@kbslaw.com
TREVOR STOCKINGER (SBN 226359)
tstockinger@kbslaw.com
KESSELMAN BRANTLY STOCKINGER LLP
1230 Rosecrans Avenue, Suite 400
Manhattan Beach, CA 90266
Tel: (310) 694-5833
Fax: (310) 307-4570

*Attorneys for Plaintiff*
KATHRYN SPLETSTOSER

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KATHRYN SPLETSTOSER, as an individual,<br><br>            Plaintiff,<br><br>    v.<br><br><br>GENERAL JOHN E. HYTEN, as an individual,<br><br>            Defendant. | Case No. 2:19-cv-10076<br><br>Judge:<br><br>**COMPLAINT**<br>**JURY TRIAL DEMANDED** |

1

Plaintiff, Kathryn Spletstoser ("Plaintiff" or "COL Spletstoser"), by her attorneys, Solomon Law firm, PLLC, Kathryn Barcroft, Esq. and Ariel Solomon, Esq., allege the following:

## OVERVIEW

1.     Defendant General John E. Hyten ("Gen. Hyten" or "Defendant") engaged in improper and unwanted sexual acts against COL Spletstoser during several after-work occasions outside the scope of her employment and not incident to her service as part of the United States Military.

2.     The acting leaders of the United States Department of Defense (the "DOD") and the United States Air Force (the "Air Force") enabled Gen. Hyten, Ms. Spletstoser's first-line supervisor, to sexually harass and assault her from approximately January 2017 through December 2017 by failing to have procedures in place in the United States military that would protect COL Spletstoser from continuing unwelcome sexual acts by Gen. Hyten.

3.     Over the course of her decades long service as a decorated member of the United States military, COL Spletstoser served with distinctionand ascended the ranks of the military, yet she was not protected when she encountered unwanted sexual advances by her supervisor.  The issue of sexual assault in the military has impacted a large number of the female servicemembers that choose to dedicate themselves to the United States military service.

4.     Gen. Hyten sexually assaulted Ms. Spletstoser behind closed doors, in acts not incident to the military service that COL Spletstoser chose to undertake on behalf of her country.

5.     Although COL Spletstoser should never have been subjected to such behavior in the first place, she took reasonable action to respond to her supervisor's inappropriate behavior after learning of his appointment to one of the highest military posts in the United States, only to be met with retaliation and damage to her own career, her identity being outed by the very military that she served, and her character defamed

COMPLAINT

in a "blame the victim" narrative created to protect the elite high-ranking members of the United States military.

## JURISDICTION AND VENUE

6.     This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 based on diversity of citizenship.  The parties are citizens of different states, and the amount in controversy exceed Seventy-Five Thousand dollars ($75,000.00), exclusive of interest and costs.

7.     This action arises under California law.

8.     Venue lies in this District pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this district.

## PARTIES

9.     Plaintiff Kathryn Spletstoser is a Colonel with the United States Army. She is a citizen of the United States and currently resides in Alexandria, VA and is domiciled in Virginia.

10.     Defendant John E. Hyten ("Gen. Hyten") is sued in his personal capacity. He was the United States Strategic Command ("STRATCOM") Commander from approximately November 3, 2016 to September 26, 2019. He is a citizen of the United States and his work address is at the Pentagon in Washington, D.C.

11.     Upon information and belief, Gen. Hyten currently resides at Joint Base Anacostia-Bolling, Washington, DC.

12.     Upon information and belief, Gen. Hyten is domiciled in Colorado Springs, Colorado.

## FACTS AND PROCEEDINGS

13.     COL Spletstoser served in the United States Army since 1989, where she began as an Airborne Parachute Rigger as part of the United States Army Reserve.

14.     COL Spletstoser was selected to serve on active duty as a Regular Army Officer upon receiving her Commission as a Second Lieutenant in 1992, and she

eventually served four combat deployments to Afghanistan in 2002 and 2005-2006 and Iraq in 2004 and 2006-2007.

15.     In the mid-1990s, COL Spletstoser served an operational tour in Bosnia-Herzegovina as part of the NATO Implementation Force.

16.     COL Spletstoser ascended the ranks of the United States Army as she was promoted early to the rank of Major in 2003.

17.     COL Spletstoser served as a White House Fellow under the Bush Administration, from in or around July 2007 until in or around December 2008, and later worked with the Obama Administration during an assignment to the Joint Staff on issues related to Afghanistan and Pakistan.

18.     COL Spletstoser served as the Operations and Plans Officer/Deputy Division Chief, with the Strategic Plans and Policy Directorate, the Joint Staff, from in or around January 2009 through May 2011.

19.     In June 2011, COL Spletstoser took command of the Headquarters and Headquarters Battalion, Eighth Army/United States Forces Korea/Combined Forces Command/United Nations Command leading arguably one of the largest and most diverse active-duty United States Army units on the Korean Peninsula.  She served in this position until in or around August 2013.

20.     In or around September 2013, COL Spletstoser was assigned to the Army staff where she served in a number of positions culminating as the Chief of Staff for the Strategic Plans and Policy Directorate Headquarters at the Department of the Army, until in or around May 2016.

21.     During this time, COL Spletstoser was promoted to the rank of Colonel, and has remained this rank in the military since on or about September 1, 2014.

22.     Even with a grueling work schedule, COL Spletstoser was highly motivated and excelled in her positions as demonstrated by her personnel file which is replete with exemplary comments regarding her performance in the military.

COMPLAINT

23. COL Spletstoser was assigned to STRATCOM in May of 2016, where she was diverted to serve as Director of the Commander's Action Group ("CAG") under Admiral Cecil Haney, who was then serving as Commander.

24. Upon information and belief, COL Spletstoser was chosen for this role based on her record of exemplary leadership, education, and accomplishment.

25. During her tenure with STRATCOM, COL Spletstoser understood Adm. Haney's directive to her, as taking steps to "fix" the CAG and have it ready in a serviceable, efficient, functioning condition by the time Air Force General John Hyten assumed command at STRATCOM.

26. Gen. Hyten became STRATCOM Commander on or about November 3, 2016, and retained COL Spletstoser as his CAG Director, based on a direct recommendation from Adm. Haney, who credited COL Spletstoser for a positive transformation of the CAG during the first six months she served as CAG Director.

27. Adm. Haney comments on COL Spletstoser's Strategic Grade Plate O-6 Officer Evaluation Report, dated November 2, 2016, for the time period May 5, 2016 through November 2, 2016, states the following: "Kathy is #1 of 74 O-6s in USSTRATCOM and her performance and potential surpasses her peers. She is already performing at the General Officer level and her experience in Strategic Plans and Policy is unmatched. Her leadership immediately transformed my CAG into a high performing organization resulting in the impactful execution of over 50 SR LDR engagements in a 6 month period. She is my first choice for promotion to BG now and clearly has the potential to serve at the senior GO ranks in the Army."

28. COL Spletstoser viewed STRATCOM as an honorable and meritocratic institution where she would have an opportunity to excel based on her abilities and hard work.

29. In or around November 2016, based on Adm. Haney's recommendation, COL Spletstoser began to report directly to Gen. Hyten as his CAG Director.

COMPLAINT

30.     COL Spletstoser served in this Director position until Gen. Hyten directed MG Karbler to relieve her from this position in retaliation for opposing Gen. Hyten's repeated sexually assaults and advancements of COL Splestoser.

31.     In or around January 2017, during a meeting before a change of command ceremony in Huntsville, Alabama with Gen. Daniel Allyn, the former Vice Chief of Staff of the Army, Gen. Hyten spoke at great length regarding how lucky he was to have COL Spletstoser working for him and stated something to the effect of how COL Spletstoser was "going to really work out" in her position.

32.     Prior to the events in this complaint, COL Spletstoser had an unblemished record, in every job to which she has been assigned in the Army, since attaining the rank of Captain in 1996, and every position other than her last position at the Defense Threat Reduction Agency/Joint Improvised-Threat Defeat Organization, has been a "by name request."

33.     Senior officers have regularly sought COL Spletstoser's expertise, counsel, temperament, and guidance for their own management and operational teams.

**I.      Gen. Hyten Repeatedly Sexually Assaulted COL Spletstoser**

34.     A few months after serving under Gen. Hyten, commencing in or around January 2017, he began to subject COL Spletstoser to unwanted sexual advances.

35.     On or about January 23, 2017, during a temporary duty assignment in Palo Alto, California related to Stanford engagements, Gen. Hyten held a brief team closeout meeting in his hotel room in the evening. Once this meeting was over, Gen. Hyten dismissed the rest of the team and requested that COL Spletstoser remain in the hotel room with him, even though the others had departed, to discuss the next day's talking points. When COL Spletstoser began to leave after this discussion, retiring from duty after a long day, Gen. Hyten unexpectedly grabbed her hand and put it on his crotch, such that she could feel his erect penis.

36.     Feeling shocked and confused, COL Spletstoser immediately left Gen. Hyten's hotel room. At this time and for the instances following until learning Gen.

Hyten was nominated for the Joint Chiefs of Staff, COL Splestoser did not report Gen. Hyten's conduct because Gen. Hyten was a four-star general and her superior. She had significant fears of retaliation and was also well-aware that, as documented in numerous studies and publications, the military treats women differently than men. As alleged below, COL Splestoster's fears were ultimately borne out when Gen. Hyten retaliated against her and the government then failed to conduct a fair investigation into Gen. Hyten's conduct.

37.    Gen. Hyten continued to sexually assault and harass COL Spletstoser for several months following this initial incident in January 2017.

38.    On or about May 18, 2017, while in Monterrey, California, COLCOL Spletstoser was with her coworkers and received a text message from Gen. Hyten asking her to come to his hotel room to go over work issues, again after work had finished for the day. When COL Spletstoser arrived, it became apparent Gen. Hyten did not text her to work. Rather, COL Spletstoser saw that Gen. Hyten was half undressed after taking a shower. Gen. Hyten then attempted to kiss COL Spletstoser and pulled her into him forcefully by her arms. COL Spletstoser told him this was inappropriate, and she did not think his wife would approve.

39.    On or about June 21, 2017, in Washington, D.C., Gen. Hyten again lured COL Spletsoser to his hotel room after hours under a false claim that there was work to be done. While there, he grabbed COL Spletstoser across the breast, turned her towards him, and began to kiss COL Spletstoser on the lips, while having his hands on her buttocks. Col Spletstoser pulled back, pushed Gen. Hyten away, and asked what he was doing or words to that effect.  COL Spletstoser informed Gen. Hyten that his comments and actions were wrong, and his behavior could not continue. COL Spletstoser then left Gen. Hyten's hotel room.

40.    On or about August 23, 2017, while in Seoul, South Korea for a Pacific Command trip, Gen. Hyten attempted to hug COL Spletstoser while rehearsing for his upcoming press conference, making contact with her breasts. Afraid that Gen. Hyten was

going to kiss her, COL Spletstoser pushed him away and told him he needed to compose himself, making clear this conduct was not part of her job and was unwelcome.

41.     In or around August 2017, COL Spletstoser was in her STRATCOM office when Gen. Hyten entered and said he wanted to talk. Gen. Hyten closed the door and laid on the couch. COL Spletstoser told him that was not acceptable and asked that he sit in the chair instead. Gen. Hyten moved to the chair and put his hand on his penis. COL Spletstoser told him to stop and asked what he wanted to discuss. These types of incidents occurred approximately an additional three times.

42.     The following month, on or about September 25, 2017, while in London, United Kingdom, after COL Spletstoser was finished with work for the day and was off duty, Gen. Hyten  texted COL Spletstoser and asked that she stop by his hotel room, after hours. In his hotel room, Gen. Hyten told COL Spletstoser that he wanted to discuss the day's meetings and events. However, during this interaction, Gen. Hyten grabbed COL Spletstoser's hand and asked for her to "stay a while" in his hotel room. COL Spletstoser informed Gen. Hyten he couldn't keep doing this and that she was uncomfortable.

43.     Notwithstanding COL Spletstoser's repeated opposition, in or around October 2017, Gen. Hyten came into her office, shut the door, and stood behind her. Gen. Hyten placed both hands on COL Spletstoser's shoulders and kissed her on the neck. He proceeded tell COL Spletstoser she was "the best" and kissed her on the head. Again, COL Spletstoser informed Gen. Hyten this was inappropriate, and asked him to stop.

44.     On or about November 19, 2017, in Halifax, Nova Scotia, Gen. Hyten asked COL Spletstoser to meet him in his hotel room before they left for the airport. Once there, Gen. Hyten hugged COL Spletstoser. COL Spletstoser again told Gen. Hyten to stop touching her.

45.     On or about December 2, 2017, Gen. Hyten's advances escalated when he forceable ejaculated after rubbing against COL Spletstoser.  Gen. Hyten and COL Spletstoser were in Simi Valley, California for the Reagan National Defense Forum. On this evening, at or around approximately 9:45-10:45 P.M. PST, Gen. Hyten came to COL

Spletstoser's hotel room, under the pretense of work-related purposes. As he knocked on the door, COL Spletstoser was applying face cream preparing to go to sleep and did not expect any visitors. Upon opening the door, Gen. Hyten walked directly into the room, wearing workout clothes.

46. Gen. Hyten told COL Spletstoser that he needed to talk about a few things and asked her to sit down with him on her bed. COL Spletstoser did not initially feel threatened, so she did so.

47. Gen. Hyten reached for COL Spletstoser's hand, which caused her to stand up and ask what he was trying to do. Gen. Hyten also stood up and pulled COL Spletstoser so closely and tightly that she could not move. He began to kiss her on the lips and grab her buttocks. Gen. Hyten told COL Spletstoser something to the effect of, "I want to make love to you." COL Spletstoser told him that wasn't going to happen. Gen. Hyten then began to rub his penis against her and ejaculated in his shorts. COL Spletstoser was then finally able to push him off of her and did so. Gen. Hyten asked COL Spletstoser if she would "tell on him." Out of fear of retaliation, she told him she would not.

## II. Gen. Hyten Retaliates Against COL Spletstoser

48. Despite COL Spletstoser's representations to Gen. Hyten that she would not disclose the assault, Gen. Hyten retaliated against her nonetheless.

49. Prior to Col. Spletstoser's repeated opposition to the sexual advancements and assaults, Gen. Hyten gave COL Spletstoser extraordinary reviews. For example:

      i. On or about November 6, 2017, Gen. Hyten contacted Gen. James McConville, via e-mail, to discuss COL Spletstoser's promotion potential, stating that "Her work at STRATCOM has been exceptional, as she works at the strategic level well-above most flag officers I know. … Kathy is extremely effective at engagement at the highest levels – the Administration, OSD, Joint Staff, and Services. With this broadening assignment at STRATCOM in her portfolio, she is well-postured to go

COMPLAINT

back to the Army and work as an XO to one of your 4- or 3-stars."

    ii.    On or about November 14, 2017, Gen. Hyten completed a Strategic Grade Plate (O6) Officer Evaluation Report pertaining to COL Spletstoser, for the time period covering November 3, 2016 through November 2, 2017, in which he stated she was an "…exceptionally competent and committed leader with the highest level of character… and her ethics are above reproach. She is a role model for peers, subordinates, and superiors…Multi-Star Potential."

    iii.    In this same Officer Evaluation Report, Gen. Hyten wrote that COL Spletstoser was "#1 of 71 O-6s in STRATCOM… Top 1% of all O-6's I have seen in my 36 years of service."

    iv.    Gen. Hyten went on to write that "Kathy will be the type of [General Officer] the Army needs at the highest levels of [Office of the Secretary of Defense], Joint Staff, and [Headquarters, Department of the Army]. If I was given one pick for Flag/General officer, of any Service, it would be Kathy Spletstoser. Ready today for [Brigadier General]; unlimited potential to lead and serve with distinction as a multi-star [General Officer]."

50.    Gen. Hyten went to great lengths on at least four interactions to let her know how deserving she was of her evaluation and she was already performing at the level of a General Officer. Accolades notwithstanding, the hostile sexual climate was increasingly threatening to COL Spletstoser, as each time she rejected Gen. Hyten, she began to fear further retaliation.

51.    COL Spletstoser's anxiety from Gen. Hyten's sexual assaults became intolerable. Although COL Spletstoser thrived in her position, she struggled emotionally as she continued to process the experience of having been sexually assaulted by Gen. Hyten on multiple occasions.

10

COMPLAINT

52.     After Gen. Hyten ejaculated in front of COL Spletstoser, she declined to spend any off-duty time with him. Gen. Hyten became upset by her repeated refusals to engage with him, and undertook a campaign to retaliate against her.

53.     For example, on or about December 22, 2017, Gen. Hyten received the results of a Preliminary Inquiry regarding the working climate of his headquarters at STRATCOM.

54.     This Preliminary Inquiry was initiated by Major General Daniel Karbler ("MG Karbler") on or about November 22, 2017 after he allegedly heard multiple STRATCOM employees complain about the workplace environment throughout May-October 2017.

55.     Gen. Hyten informed COL Spletstoser that the Preliminary Inquiry was his idea and he directed MG Karbler to initiate it.

56.     The results of the Preliminary Inquiry included complaints about multiple people, offices, and sections throughout Gen. Hyten's command, however only COL Spletstoser was targeted  by Gen. Hytan for further investigation.

57.     COL Spletstoser was targeted for further investigation, even though the Inquiry highlighted that Gen. Hyten was an active participant in, knew of, and promoted COL Spletstoser's leadership style.

58.      More specifically, on or about January 10, 2018, Gen. Hyten called COL Spletstoser into his office and told her that he was initiating an AR 15-6 investigation against her. regarding her leadership style.

59.     Upon information and belief, AR 15-6 investigations triggered by complaints over managerial style are inconsistent with past practice, including when the alleged management style was never the subject of past disciplinary or other corrective action.

60.     Prior to the AR 15-6 investigation, COL Spletstoser reported other problems within the command to Gen. Hyten, including Navy RDML John Spencer's bullying, internal command climate issues, and reliance on questionable legal advice and guidance,

yet  Gen. Hyten never commenced an AR 15-6 investigation regarding any of the issues reported by COL Spletstoser regarding others subject to the Preliminary Inquiry.

61.     Sworn statements gathered during the AR 15-6 investigation indicated that Gen Hyten sanctioned, participated in, promoted, encouraged, and witnessed COL Spletstoser's leadership style, even though  he later claimed in Congressional testimony that he knew nothing about her leadership style until the 15-6. In fact, he told COL Spletstoser to be the one to challenge other leaders in the command - to be the bad guy - so he could be the good guy.

62.     Despite being the convening official of the AR 15-6 investigation and a material witness, Gen. Hyten did not permit the AR 15-6 to go outside of his command so that it could be independently conducted.

63.     Despite his initiation of the AR 15-6 investigation, Gen. Hyten witnessed almost all of the events listed in the investigation, and he never took any disciplinary action against COL Spletstoser, nor did he counsel her on her leadership style.

64.     Brigadier General Gregory Bowen ("BG Bowen") was selected as the investigator for the AR 15-6, and MG Karbler was selected as the appointing/approval authority.

65.     The selection of BG Bowen and MG Karbler was improper, per Army regulations, because both worked in STRATCOM and were directly and personally involved in the alleged incidents regarding COL Spletstoser and had an actual or perceived bias and/or conflict of interest in the investigation.

66.     Responsibilities associated with conducting the AR 15-6 should have been sent to the next higher authority, or to an independent investigator for review and possible investigation.

67.     On or about February 12, 2018, BG Bowen gave COL Spletstoser a copy of the AR 15-6 investigation.

68.    On or about February 24 or 25, 2018, the AR 15-6 investigation was presented to MG Karbler for his review. MG Karbler read and discussed it with Gen Hyten.

69.    Upon information and belief, Gen. Hyten took extraordinary measures to ensure the AR 15-6 would not go outside the command for an independent investigation.

70.    Moreover, the results of the AR 15-6 highlighted Gen. Hyten's and MG Karbler's involvement and participation in the same alleged conduct that they believed constituted a hostile working environment created by COL Spletstoser.

71.    BG Bowen, in particular,  cited to statements in his report that were critical of COL Spletstoser to support his conclusion that she created or contributed to a toxic work environment, while eschewing statements that were blatantly exculpatory. Demonstrably, the AR 15-6 investigation included statements regarding COL Spletstoser's leadership at STRATCOM:

      i.    Derek Lane Ligon,   stated "…COL Spletstoser is the type of leader/director that our military would benefit from if more leaders were similar. She has an amazing grasp of the subject matter that is important to this command and the Department of Defense, the means to communicate the best way forward in solving complex problems, the wisdom to recognize destructive group-think when it inevitably occurs in large bureaucratic organizations, the will to direct people to the appropriate tasks even if it's not convenient or fun, and most importantly, she possesses the fortitude to hold people accountable (above and below her position of authority) for their actions and/or inaction – even if it ruffles feathers or rattles cages. […]  I appreciate the method by which COL Spletstoser directs me and my cohorts in the CAG to ensure we understand the expectations placed upon the quality of work we produce. She is forthright, honest, and holds us accountable..."

COMPLAINT

ii. Lieutenant Commander Christopher Amis stated, "[COL Spletstoser] has always been polite and amenable toward me. I have never personally witnessed her act or treat others inappropriately. My general impression of her leadership style is that [she] is results driven."

iii. Nina M. Armagno stated, "I've also seen COL Spletstoser's brash behavior directly with Gen. Hyten, and he seems to value it. She is very direct with him, saying things like 'do you really want to say this, boss, or would this be better?' And he follows her counsel."

iv. Logan J. Kerschner stated, "I believe COL S rightfully holds an extremely high standard for the performance of those working in the CAG and the products produced for the commander. When performance or products are not meeting the standard, she is very direct in letting you know and ultimately rectifying the situation. […] COL S refuses to allow for mission failure if it is within her control to fix it. I do not take any of this personal or have issue with how she has treated me. All planning and products are for the 4-star commander, and I expect to be driven hard and held to a high standard."

v. Philip Roman Rusiecki stated, "COL Spletstoser is direct, and to the point. She has a strong personality and likes being in charge. I believe this attitude is what propelled the CAG to perform at a higher level of efficiency and accuracy."

72. Importantly, the AR 15-6 results showed no evidence that COL Spletstoser violated any punitive regulations or article of the Uniform Code of Military Justice (UCMJ).

73. Nonetheless, contrary to this evidence, on or about February 26, 2018, MG Karbler, at the request of Gen. Hyten, relieved COL Spletstoser from her position as CAG Director allegedly due to findings from the AR 15-6 investigation, which allegedly confirmed her toxic leadership.

COMPLAINT

74.    Upon information and belief, Gen. Hyten used the results of this investigation to remove COL Spletstoser from her position as Director of his Commander's Action Group, and to set into motion events culminating with the issuance of a General Officer Memorandum of Reprimand, and negative evaluation report.

75.    In furtherance of his retaliatory campaign, on or about March 12, 2018, Gen. Hyten met with COL Spletstoser, andgave her an ultimatum, to retire immediately and go out "on top," with good character reference for future jobs. He specifically stated "all you have to do is ask and I will say whatever you want if you retire now…"

76.    On that same day, COL Spletstoser was forced to retire.

77.    In or around May 2018, COL Spletstoser rescinded her retirement because senior officers understood that the retirement was not consensual.

78.    Shortly after learning Spletstoser rescinded her retirement, in or around July 11, 2018, Gen. Hyten issued a memorandum for record regarding three interactions with COL Spletstoser between January 10, 2018 and February 28, 2018, in which Gen. Hyten falsely alleged COL Spletstoser disrespected him or expressed intent to cause herself harm.

79.    Immediately thereafter, Gen. Hytenissued COL Spletstoser a negative Officer Evaluation Report ("OER") July 20, 2018, for the rating period from November 3, 2017 through March 12, 2018 with a relief for cause.

III.    **Disclosure of Sexual Assaults and Failure to Properly Protect the Victim**

80.    In an announcement on or about April 9, 2019, COL Spletstoser learned that Gen. Hyten was nominated to become the Vice Chairman of the Joint Chiefs of Staff.

81.    On or about April 12, 2019, COL Spletstoser disclosed Gen. Hyten's numerous sexual assaults to the Air Force Office of Special Investigation ("AFOSI" or "OSI") in a Memorandum for the Record.

82.    Previous to the April 9, 2019 announcement, Gen. Hyten had made statements to COL Spletstoser about his intent to retire, and she planned to not report the incidents she had endured out of fear of retaliation.

COMPLAINT

83.    After his nomination to the second-highest military job in the country, COL Spletstoser felt that she had a moral responsibility to disclose his wrongdoing.

84.    On or about April 15, 2019, AFOSI began investigating COL Spletstoser's allegations.

85.    There was a wiretap pretext phone call arranged by OSI, on or about April 24, 2019, however, the subject of the call, Gen. Hyten, was not alone as is customary in these types of calls, instead he was in the car with his wife. Further, upon information and belief, Gen. Hyten likely had advance notice of the pretext phone call.

86.    In spite of this, while on the wiretap pre-text phone call pertaining to the OSI investigation, Gen. Hyten made threatening and stalking-related comments to COL Spletstoser, including words to the effect of, "I have my eye on you."

87.    Additionally, Gen. Hyten conveyed threats to call COL Spletstoser's new boss repeatedly to check up on her and see how she was doing with the intent to further adversely impact her career and reputation.

88.    Gen. Hyten's comments during the pretext call resulted in the issuance of a Military Protective Order ("MPO"), signed by the Air Force Chief of Staff Colonel Stephen Wilson, on or about May 10, 2019, ordering him not to have any contact with COL Spletstoser, and it was applicable for a 6 month period.

89.    Upon information and belief, Gen. Hyten completed a subject interview by OSI on or about May 16, 2019, and OSI notified COL Spletstoser and her special victims counsel that the criminal investigation was completed on or about June 7, 2019.

90.    Upon information and belief, COL Spletstoser's  was not supported by the military with respect to her claims of sexual assault where she encountered a process biased against victims.

91.    For example, the investigation was handled by the OSI Detachment at Andrews Air Force Base. OSI agents traveled to Offutt AFB, and Gen Hyten knew well in advance that he was going to be interviewed and the general nature of the allegations and had a senior defense counsel from the Air Force assigned and present.

COMPLAINT

92.     Because Gen. Hyten, upon information and belief, was tipped off about the interview and there may not have been the proper level of interrogation in the interview. Gen. Hyten, upon information and belief, had prior notice and attended with an attorney present.  The deference accorded to Gen. Hyten is typically not accorded other service members accused of circumstances involving felony level crimes, like the sexual assault Gen. Hyten was alleged to have committed.

93.     Upon information and belief (as the formal delegation documents were not provided to the victim's military counsel despite repeated requests), then-Acting Secretary at the Department of Defense Patrick Shanahan designated to the Secretary of the Air Force,who in turn designated General Holmes as the Convening Authority/Disposition Authority

94.     Acting Secretary Shanahan, as Gen. Hyten's immediate superior, was uniquely positioned to convene an investigation into COL Spletstoser's allegations of sexual harassment and sexual assault which would have the greatest chance of being objectively and independently conducted and proceed to appropriate prosecution if warranted.

95.     When Acting Secretary Shanahan delegated this authority to Secretary of the Air Force, Heather Wilson, and Secretary Wilson in turn delegated disposition authority to Gen. Holmes, who was junior to Gen. Hyten and knew him personally as a peer.

96.     As a result of designating this authority down, ultimately to Gen. Holmes, Acting Secretary Shanahan and Secretary Wilson allowed and proximately caused an inadequate and conflicted investigation.

97.     Appointing an official more senior then Gen. Hyten and in a different service would have avoided any concerns regarding conflicts of interest.

98.     Further, the Air Force holds conferences multiple times a year called Corona in which 4-Star Generals meet, and upon information and belief, the investigator and Gen. Hyten were familiar with each other from these conventions.

99.     In order to avoid a conflict of interest or bias, a more-senior official and/or an official from a different service branch should have been selected as the convening and disposition authority, specifically as the investigation pertains to felony-level allegations.

100.    DOD's rules and regulations never contemplated accusations against a 4-Star General, which complicated the procedures.

101.    The OSI Investigator gathered derogatory statements immaterial to allegations, including, but not limited to, numerous complaints about COL Spletstoser's personality, a statement she was a lesbian, and negative statements regarding Spletstoser's mental health.

102.    The OSI Report of Investigation ("ROI") mischaracterized the context of a wire tapped pretext phone call between COL Spletstoser and Gen. Hyten.  The report also improperly suggested that COL Spletstoser violated a no-contact order by calling Gen. Hyten, which is not accurate, as COL Spletstoser was assisting the OSI.

103.    The OSI investigator conducted an inadequate email search, as they had no involvement with COL Spletstoser regarding what she alluded to being present, and thereby did not know what information to look for.

104.    The ROI states there were no text messages between COL Spletstoser and Gen. Hyten, however the phone they examined was not the phone Gen. Hyten had during the relevant periods of this complaint due to a phone refresh.

105.    Despite multiple requests, including formal FOIA requests, the Air Force and AFOSI refuse to release critical emails for review.  These emails contain material evidence that highlight a familiar relationship between a four-star general and a colonel.

106.    Evidence provided by COL Spletstoser such as trip logs that corroborated her claims and locations were provided but not included as an Exhibit to the ROI.

107.    The ROI included irrelevant statements that improperly suggest that COL Spletstoser's allegations were unfounded, including statements made by individuals who

were not present and would not be able to recall one-on-one meetings between Gen. Hyten and COL Spletstoser.

108.   OSI handled the investigation while also being in charge of Gen. Hyten's security detail.  OSI had corroborated COL Spletstoser's information on the sexual assault locations and other acts, and Gen. Hyten confirmed the times he was alone with COL Spletstoser, but his security detail falsely alleged they never saw them together.

109.   Gen. Hyten admitted that he has been alone with COL Spletstoser.

110.   At least one of member of Gen. Hyten's security detail stated that COL Spletstoser seemed distant and not herself for the remainder of the trip following the December 2, 2017 incident OSI never followed up with the security detail to discuss this factual allegation or other matters relevant to Ms. Spletstoser as a victim that supported her statements.

111.   One witness, Laura Hyten (Gen. Hyten's wife), told investigators that Gen. Hyten's lawyer recommended he take a polygraph and that he "paid a lot of money" to do so.  Ms. Hyten went on to state that the results were inconclusive, which upset Gen. Hyten.  However, there was no follow through concerning the results of the polygraph.

112.   Per the Intelligence Community Policy Directive 704.2, "sexual behavior of a criminal nature whether or not the individual has been prosecuted" and "criminal conduct" are guidelines that should be considered when determining an individual's access to classified information.  Gen. Hyten, however, was not removed or suspended from the command of STRATCOM while under investigation and his security clearances were not suspended.

113.   Investigations conducted by OSI usually take approximately six months to conduct; the investigation into Gen. Hyten was conducted over only three months, from April 15, 2019 to June 23, 2019.  The date of the final ROI report was June 23, 2019

114.   Although OSI's ROI did not contain any information from mental health experts, and none of the information was reviewed by a forensic psychologist, the report contained unsubstantiated conclusions regarding COL Spletstoser's mental health.

COMPLAINT

115.   The ROI also contained a ten-year-old sexual harassment complaint filed by COL Spletstoser but did not include information regarding other parties who filed complaints against the same supervisor, or that the Supervisor was ultimately reprimanded. Upon information and belief, this was included in the ROI to attempt to suggest COL Spletstoser had a history of false reporting.

116.   On or about July 8, 2019, July 12, 2019 and July 29, 2019, AFOSI provided Supplemental Investigative Communications.   As with the original ROI, the Supplemental Investigative Activities provided information that supported the "blame the victim" narrative.

117.   Following the OSI investigation, Department of Defense ("DOD") and the Air Force did not punish or dismiss Gen. Hyten, and no action was taken against him.

118.   Gen. Holmes, as the Disposition Authority, could have decided between a few alternatives to take action in response to the OSI investigation.   Gen. Holmes could have sent preferred charges for an Article 32 Preliminary Inquiry, he could have issued an administrative letter of reprimand, or he could have initiated an Article 15 non-judicial punishment.

119.   Gen. Holmes chose to do nothing.

120.   On or about June 13, 2019, COL Spletstoser put in a memorandum for all reviewing authorities in accordance with her rights under Rules for Courts-Martial 3069(e) and DODI 1030.2, paragraph 6.3.1.1, requesting a personal appearance to discuss her allegations.

121.   COL Spletstoser's requests were denied.

122.   On or about September 20, 2019, the MPO against Gen. Hyten was lifted, only six days before his confirmation vote. The MPO was set to expire in November 2019 and Col Spletstoser's Special Victims' Counsel planned to ask for its renewal for another six months because Gen Hyten was moving to the Washington, DC area for his new job, and he knows where COL Spletstoser lives.

123.   On or about September 26, 2019, Gen. Hyten was confirmed as the Vice Chairman of the Joint Chiefs of Staff and is currently the second most Senior Officer in the United States Military.  Only one military officer, the Chairman of the Joint Chiefs of Staff is higher in position. Gen Hyten is now the number one in line as the successor to the Chairman of the Joint Chiefs of Staff and the principal military advisor to the President.

124.   By failing to adequately punish a perpetrator of sexual violence, the DOD sent a message to male employees in all of the branches of the military that they would continue to tolerate sexual violence. They created a system in which male employees, especially those who are high-ranking, understood that they could sexually assault their female colleagues with near impunity, while at the same time teaching female employees that they risked their own reputations and careers by reporting assault, as no action would be taken against the assailant, instead they would be promoted.

IV.   **Statistics in the Military Reflect High Rates of Sexual Assault, Fear of Reporting & Retaliation**

125.   In the military, approximately 76% of women who are sexually assaulted never report the incident based on the Protect Our Defenders, *Military Sexual Assault Fact Sheet* dated July 2019.

126.   In COL Spletstoser's case, this problem is compounded by Gen. Hyten's rank.

127.   The culture fostered at STRATCOM allowed for COL Spletstoser to be bullied and disrespected because of her sex.

128.   COL Spletstoser acted in a way that is commensurate with what is expected for a Colonel working for a 4-star general.

129.   In his interview with *Omaha World-Herald* on November 18, 2019, Gen. Hyten stated "[t]he numbers show we are not getting markedly better, and we should. Everybody that comes in the military deserves to work in a place that treats them with

dignity and respect at all times. Any time that doesn't, we have to do better." Yet, Gen. Hyten, himself, sexually assaulted his subordinate and failed to treat her with dignity.

130. Upon information and belief, women at STRATCOM receive far fewer promotions than men.

131. The officer core in the Army is approximately 18% women. (Counsel on Foreign Relations, *Demographics of the U.S. Military,* April 24, 2018)

132. In 2014, the National Defense Research Institute estimated that approximately 1 in 20 military servicewomen were sexually assaulted the previous year, but that less than 1 in 100 servicemen were assaulted during that same period.

133. Reports from the Department of Defense's Sexual Assault Prevention and Response Office ("DOD SAPRO") estimate that the number of sexual assaults of military members was higher in Fiscal Year 2018 than in the previous four years.

134. DOD SAPRO estimated that in Fiscal Year 2018 nearly 1 in 4 servicewomen were sexually harassed, but that only about six percent of servicemen were sexually harassed during this period.

135. DOD SAPRO also found that (i) only 5.3% of unrestricted reports of sexual assault result in trial by court martial; (ii) 64% percent of women who report sexual assault subsequently face retaliation for doing so; (iii) of the servicemembers who face retaliation for reporting their sexual assaults, 66% face retaliation from individuals within the reporters' chains of command.

136. Victims of sexual harassment and/or sexual assault are separated from the military with less than fully honorable conditions 24% of the time, whereas the rate of separation from the military with less than fully honorable conditions is 15% for all servicemembers as referenced in Protect Our Defenders, *Military Sexual Assault Fact Sheet,* July 2019).

137. STRATCOM's environment permitted servicewomen to be sexually harassed and assaulted more and showed less respect than male counterparts.

138.   Upon information and belief, Officials at DOD and the Air Force knew of the pervasive threats facing female employees in its subordinate commands, including STRATCOM, and failed to act or acted with deliberate indifference to the evidence of pervasive sexual assault and harassment.

139.   As a result of the acts and omissions of the Defendant, COL Spletstoser's reputation has been irrapably harmed, she was forced to retire and she has experienced an overall decline in her quality of life.

## LEGAL CLAIMS

### FIRST CAUSE OF ACTION

**(Sexual Battery, California Civil Code § 1708.5, Against Defendant Gen. Hyten)**

140.   COL Spletstoser repeats and realleges the allegations contained in paragraphs 1 through 139 above as though the same were set forth in full herein.

141.   Gen. Hyten subjected COL Spletstoser to unwanted physical contact that was harmful and sexually offensive.

142.   Gen. Hyten subjected COL Spletstoser to unwanted physical contact on multiple occasions when he Gen. Hyten physically restrained COL Spletstoser by summoning her to his hotel room where he confined her, forced her hand to his penis, kissed her, hugged her, touched her breasts and buttocks, and rubbed his genitals against her body until he ejaculated.

143.   Gen. Hyten intended to cause harmful and sexually offensive physical contact with COL Spletstoser when he made repeated advances toward her causing her apprehension, including, without limitation, grabbing her breasts, grabbing and/or touching her buttocks, kissing and hugging her, forcing her hand on his erect penis, restraining her and rubbing his penis against her until he ejaculated.

144.   General Hyten's conduct was offensive to a reasonable sense of personal dignity and did so offend COL Spletstoser's sense of personal dignity.

145.   COL Spletstoser did not consent to any of the acts of physical contact and repeatedly informed Gen. Hyten that his actions were unwanted, and inappropriate.

146.   Gen. Hyten's actions were carried out for the sole purpose of his own arousal and sexual gratification.

147.   By taking these actions, Gen. Hyten committed a sexual battery as that term is defined by California Civil Code § 1708.5.

148.   Each and every intentional and unwanted sexually offensive physical contact with COL Spletstoser resulted in a sexual battery.

149.   Grabbing COL Spletstoser's breasts and buttocks and restraining her to rub his penis against her body until he ejaculated, was outside the scope of Defendant's employment with the United States Air Force.

150.   Gen. Hyten's actions of grabbing COL Spletstoser's breasts and buttocks and restraining her to rub his penis against her body until he ejaculated furthered no military purpose and was not incidental to military service.

151.   The act of grabbing COL Spletstoser's breasts and buttocks and restraining her to rub his penis against her body until he ejaculated represented a substantial deviation from Gen. Hyten's duties.

152.   Defendant's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's rights.

153.   As a direct and proximate result of Defendant's conduct, Plaintiff has sustained and will continue to sustain economic injury in the form of loss of wages, loss of benefits, irreparable damage to her reputation, severe emotional distress, physical and mental health   problems and legal expenses to date, all of which caused permanent economic injury to be determined at trial.

154.   COL Spletstoser is entitled to punitive damages because Defendant acted with malice, oppression, and a willful and conscious disregard of the rights or safety of others when sexually battering Plaintiff.

/ / /

/ / /

/ / /

## SECOND CAUSE OF ACTION

### (Assault, Against Defendant Gen. Hyten)

155.   COL Spletstoser repeats and re-alleges the allegations contained in paragraphs 1 through 154 above as though the same were set forth in full herein.

156.   Gen. Hyten intended to cause harmful and offensive contact with COL Spletstoser when he made repeated advances toward her, including, without limitation, grabbing her breasts, grabbing and/or touching her buttocks, kissing and hugging her, forcing her hand on his penis,  restraining her and rubbing his penis against her body until he ejaculated.

157.   Gen. Hyten's pattern of sexual advancement toward COL Spletstoser and physical restraint of Plaintiff in Defendant's hotel room lead her to reasonably believe she would be touched in a harmful or sexually offensive way.

158.   During the incidents of Gen. Hyten making contact with Col. Spletstoser described herein, and during the incidents in which Gen. Hyten touched his own penis through his pants, Col. Spletstoser reasonably believed she was about to be touched in a harmful or sexually offensive way, and was in imminent apprehension of such harmful or offensive contact.

159.   Gen. Hyten's actions were unwanted and unwelcome.

160.   Gen. Hyten committed a sexual assault as defined by California Code of Civil Procedure § 340.16(b)(1), when he sexually battered COL Spletstoser, while physically restraining her and forcibly grinding his genitals against her.

161.   COL Spletstoser was consequently injured, damaged, and/or harmed as a direct and proximate result of Gen. Hyten's actions.

162.   Gen. Hyten's actions were outside the scope of his employment with the United States Air Force.

163.   Gen. Hyten's sexual assault of COL Spletstoser COL Spletstoser furthered no military purpose and was not incidental to military service in any capacity.

164.   Gen. Hyten's described actions represented a substantial deviation from his duties.

165.   Gen. Hyten's actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's rights and person dignity.

166.   As a direct and proximate result of Defendant's conduct, Plaintiff has sustained and will continue to sustain economic injury in the form of loss of wages, loss of benefits, irreparable damage to her reputation, severe emotional distress, physical and mental health    problems and legal expenses to date, all of which caused permanent economic injury in an amount to be determined at trial.

167.   COL Spletstoser is entitled to punitive damages because Defendant acted with malice, oppression, and a willful and conscious disregard of the rights or safety of others when sexually assaulting Plaintiff.

### THIRD CAUSE OF ACTION

### (Gender Violence, California Civil Code § 52.4, Against Gen. Hyten)

168.   COL Spletstoser repeats and re-alleges the allegations contained in paragraphs 1 through 167 above as though the same were set forth in full herein.

169.   Gen. Hyten's physical restraint of COL Spletstoser and use of force when grabbing Col Spletstoser's breasts, grabbing and/or touching her buttocks, kissing and hugging her, forcing her hand on his erect penis, and grinding against her body until ejaculating constitutes a criminal offense of sexual battery as defined by California Penal Code § 243.4(d).

170.   Gen. Hyten's actions were motivated in whole or in part on the basis of COL Spletstoser's gender, and therefore constitutes Gender Violence, as the term is defined by California Civil Code § 52.4.

171.   COL Spletstoser was consequently injured, damaged, and/or harmed as a direct and proximate result of Gen. Hyten's actions.

172.   Gen. Hyten's actions were outside the scope of his employment with the United States Air Force.

COMPLAINT

173.   Gender violence does not further a military purpose and is not incidental to military service, in any capacity.

174.   Gen. Hyten's described actions represent substantial deviations from his duties.

175.   As a direct and proximate result of Defendant's conduct, Plaintiff has sustained and will continue to sustain economic injury in the form of loss of wages, loss of benefits, irreparable damage to her reputation, severe emotional distress, physical and mental health   problems and legal expenses to date, all of which caused permanent economic injury in an amount to be determined at trial.

176.   COL Spletstoser is entitled to punitive damages because Defendant acted with malice, oppression, and a willful and conscious disregard of the rights or safety of others when sexually assaulting Plaintiff.

### FOURTH CAUSE OF ACTION

**(Intentional Infliction of Emotional Distress Against Defendant Gen. Hyten)**

177.   COL Spletstoser repeats and re-alleges the allegations contained in paragraphs 1 through 176 above as though the same were set forth in full herein.

178.   Gen. Hyten's behavior described above, including but not limited to, physically restraining COL Spletstoser against her will, touching her breasts, grabbing and/or touching her buttocks, penetrating COL Spletstoser's mouth with his tongue, and forcibly rubbing his genitals against her body until ejaculating, is both extreme and outrageous conduct.

179.   The extreme and outrageous nature of the conduct is compounded by the Gen. Hyten's senior status and his undeterred advances, even though he was aware his conduct was unwanted, and because COL Spletstoser was in his chain of supervision as someone with whom he interacted in a mentor/mentee capacity.

180.   Gen. Hyten was repeatedly told his advances were unwanted and he therefore knew, or should have known, that his physical contact with COL Spletstoser would cause severe emotional distress.

181.   Gen. Hyten's continued advances over COL Spletstoser's repeated opposition was undertaken with the intention of causing COL Spletstoser emotional distress, and/or with reckless disregard for the probability that he would cause her emotional distress.

182.   Gen. Hyten's actions were for the sole purpose of his own sexual arousal and sexual gratification.

183.   These actions constituted sexual assault as defined by California Code of Civil Procedure § 340.16(b)(1).

184.   Gen. Hyten's actions were the actual and proximate cause of COL Spletstoser severe and extreme emotional distress.

185.   By taking the extreme and outrageous actions described herein with the intention of, or reckless disregard for, causing extreme and severe emotional distress, Gen. Hyten subjected COL Spletstoser to intentional infliction of emotional distress.

186.   Gen. Hyten's extreme and outrageous behavior was outside the scope of his employment with the United States Air Force.

187.   Gen. Hyten's extreme and outrageous actions furthered no military purpose and were not incidental to military service.

188.   Gen. Hyten's conduct represented a substantial deviation from Gen. Hyten's duties.

189.   As a direct and proximate result of Defendant's conduct, Plaintiff has sustained and will continue to sustain economic injury in the form of loss of wages, loss of benefits, irreparable damage to her reputation, severe emotional distress, physical and mental health   problems and legal expenses to date, all of which caused permanent economic injury in an amount to be determined at trial.

190.   COL Spletstoser is entitled to punitive damages because Defendant acted with malice, oppression, and a willful and conscious disregard of the rights or safety of others when sexually assaulting Plaintiff.

## FIFTH CAUSE OF ACTION

### (Battery Against Defendant Gen. Hyten)

191.   COL Spletstoser repeats and re-alleges the allegations contained in paragraphs 1 through 190 above as though the same were set forth in full herein.

192.   Gen. Hyten intended to cause the physical contacts with Col. Spletstoser described herein.

193.   Gen. Hyten intended these physical contacts to harm and/or offend Col. Spletstoser and/or acted with a willful disregard for Col. Spletstoser's rights.

194.   A reasonable person in Col. Spletstoser would have been offended by the physical contacts described herein.

195.   Each and every one of these physical contacts were unwelcomed and unwanted by Col. Spletstoser.

196.   Col. Spletstoser did not consent to any of these physical contacts and on many occasions stated to Col. Spestoser that these were unwanted and inappropriate and had to cease.

197.   Col. Spletstoser was injured, damaged, and/or harmed by these unwanted physical contacts.

198.   Gen. Hyten, by intentionally carrying out the unwanted and non-consented-to physical contacts with intent to harm Col. Spletstoser and/or willful disregard for Col. Spletstoser's rights, and thereby causing Col. Spletstoser injury, damage, and/or harm, committed the offense of battery against her with each and every such contact.

199.   Gen. Hyten's physical contacts with Col. Spletstoser were outside the scope of Gen. Hyten's and Col. Spletstoser's employment.

200.   Gen. Hyten's physical contacts with Col. Spletstoserfurthered no military purpose and were not incidental to military service.

201.   The actions described \were a substantial deviation from Gen. Hyten's duties.

COMPLAINT

## SIXTH CAUSE OF ACTION

### (Ralph Act (California Civil Code § 51.7) Claim Against Defendant Gen. Hyten)

202.   COL Spletstoser repeats and re-alleges the allegations contained in paragraphs 1 through 201 above as though the same were set forth in full herein.

203.   Gen. Hyten's actions described herein, including, without limitation, his physical restraint of Col. Spletstoser, forcing of her hand to his penis, unwanted kissing and hugging of her, touching of her breasts and buttocks, and rubbing of his genitals against his body until he ejaculated, each constituted an act of violence and/or threat of a violent act against Col. Spletstoser.

204.   Each time Gen. Hyten touched his penis through his pants while on the couch

205.   in Col. Spletstoser's office constituted a threat of a violent act against Col. Spletstoser.

206.   Gen. Hyten took the above-complained of actions because or on account of Col. Spletstoser's sex (female).

207.   Col. Spletstoser was harmed by Gen. Hyten's acts of violence and threats of violence described herein.

208.   Gen. Hyten's conduct was a substantial factor in causing Col. Spletstoser's harm.

209.   By taking the above described actions, and consequently causing Col. Spletstoser resulting harm, Gen. Hyten violated the Ralph Act (California Civil Code § 51.7).

210.   As a result of his violations of California Civil Code § 51.7, Gen. Hyten is liable to Col. Spletstoser for her actual damages, exemplary damages, a civil penalty of Twenty-Five-Thousand dollars ($25,000.00), and attorney's fees.

211.   Gen. Hyten's acts of violence and threats of violence agaist Col. Spletstoser were outside the scope of Gen. Hyten's and Col. Spletstoser's employment.

212.   Gen. Hyten's acts of violence and threats of violence against Col. Spletstoser furthered no military purpose and were not incidental to military service.

COMPLAINT

213.   The actions described were a substantial deviation from Gen. Hyten's duties.

## SEVENTH CAUSE OF ACTION

### (Tom Banes Civil Rights Act (California Civil Code § 52.1)

### Against Defendant Gen. Hyten)

214.   COL Spletstoser repeats and re-alleges the allegations contained in paragraphs 1 through 213 above as though the same were set forth in full herein.

215.   Gen. Hyten's physical restraint of Col. Spletstoser, forcing of her hand to his penis, unwanted kissing and hugging of her, touching of her breasts and buttocks, and rubbing of his genitals against his body until he ejaculated, each constituted an act of intimidation, coercion, threat of violence, and violent action against Col. Spletstoser.

216.   These acts of intimidation, coercion, threats of violence, and violent actions against Col. Spletstoser interfered with Col. Spletstoser's rights under the laws and Constitution of the State of California, including, without limitation, her right to be free from battery, assault, sexual battery (as defined by California Civil Code § 1708.5), gender violence (as defined by California Civil Code § 52.4), and violations of the Ralph Act.

217.   Col. Spletstoser was harmed by Gen. Hyten's acts of intimidation, coercion, threats of violence, and violence described herein.

218.   Gen. Hyten's conduct was a substantial factor in causing Col. Spletstoser's harm.

219.   By taking the above described actions, and consequently causing Col. Spletstoser resulting harm, Gen. Hyten violated the Thomas Banes Act (California Civil Code § 52.1).

220.   As a result of his violations of California Civil Code § 52.1, Gen. Hyten is liable to Col. Spletstoser for up to three times the amount of her actual damages (but not less than Four-Thousand dollars ($4,000)), exemplary damages, a civil penalty of Twenty-Five Thousand dollars ($25,000)  attorney's fees, and attorney's fees.

221.    Gen. Hyten's acts of intimidation, coercion, threats of violence, and violence were outside the scope of Gen. Hyten's and Col. Spletstoser's employment.

222.    Gen. Hyten's acts of intimidation, coercion, threats of violence, and violence furthered no military purpose and were not incidental to military service.

223.    The actions described were a substantial deviation from Gen. Hyten's duties.

## JURY TRIAL DEMAND

COL Spletstoser hereby demands a trial by jury with respect to each claim in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, COL Spletstoser respectfully requests that this Court:

A.    Award COL Spletstoser compensatory damages in an amount to be proven at trial, but in excess of $75,000;

B.    Hold Defendants jointly and severally liable for compensatory damages; and

C.    Direct Defendants to pay Plaintiff punitive damages;

D.    Enter a Declaratory Judgment that the actions of Defendants violated the United States Constitution;

E.    Award Plaintiff reasonable attorney's fees, expert fees, and all other costs and disbursements associated with this action;

F.    Grant such other relief as the Court deems just and equitable.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

COMPLAINT

Dated:  November 25, 2019

Respectfully Submitted,

By: _____

Majed Dakak (SBN 271875)
Trevor Stockinger (SBN 226359)
Kesselman Brantly Stockinger LLP
1230 Rosecrans Avenue, Suite 400
Manhattan Beach, CA 90266
Tel: (310) 694-5833
Fax: (310) 307-4570
mdakak@kbslaw.com
tstockinger@kbslaw.com

Kathryn Barcroft, *pro hac vice pending*
Ariel E. Solomon, *pro hac vice pending*
300 Great Oaks Blvd Ste 312
Albany, New York 12203
Tel: (866) 833-3529
Fax: (202) 688-1896
kbarcroft@fedemploylaw.com
asolomon@fedemploylaw.com

Attorneys for Plaintiff
KATHRYN SPLETSTOSER

COMPLAINT